**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**ANTHONY D. AMAKER,**

and

**RUHULLAH HIZBULLAH,**                                              06-CV-490E(Sr)

        Plaintiffs,

v.

**Commissioner Glenn S. Goord, et al.,**

        Defendants.
_____

## REPORT, RECOMMENDATION AND ORDER

This matter was referred to the undersigned by the Hon. John T. Elfvin, for all pretrial matters and to hear and report upon applications for injunctive relief. Dkt. #31.

In their amended complaint, plaintiffs seek injunctive relief, declaratory judgment, and compensatory and punitive damages for violations of their religious beliefs and cultural ethnicity as protected by the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), during their incarceration within the New York State Department of Corrections ("DOCS"). Dkt. #22. As members of the Nation of Islam/Al-Islam seeking to follow doctrine prohibiting the cutting of their hair, plaintiffs challenge DOCS' policy of refusing to permit individuals who have designated their religion as anything other than Rastafarian to wear dreadlocks. Dkt. #22.

Currently before the Court are the following motions:

1. plaintiff Amaker's motion for a temporary restraining order and preliminary injunction precluding defendants from enforcing any and all disciplinary sanctions based upon his refusal to cut his dreadlocks (Dkt. #34);

2. plaintiff Amaker's motion for reconsideration of the Memorandum and Order of the Hon. John T. Elfvin (Dkt. #39), denying his motion for a temporary restraining order (Dkt. #40);[1]

3. plaintiff Hizbullah's motion for a temporary restraining order prohibiting defendants from precluding plaintiff's attendance at Nation of Islam services and classes because he has dreadlocks (Dkt. #41);

4. plaintiff Amaker's motion for a preliminary injunction preventing defendants from punishing him with further keeplock and SHU confinement for his refusal to cut his hair or change his religion (Dkt. #43);

5. plaintiff Amaker's motion for a temporary restraining order and preliminary injunction preventing defendants from interfering with receipt of legal mail and packages ordered by plaintiff's family members from outside vendors for delivery to him at the Wende Correctional Facility ("Wende") (Dkt. #48); and

6. plaintiff Amaker's motion to expedite consideration of his motion for a temporary restraining order and preliminary injunction.

Dkt. #51.  For the following reasons, it is recommended that the Court enter a preliminary injunction preventing defendants from punishing plaintiffs for refusing to cut their hair or refusing to change their religious affiliation, and preventing defendants from

---

[1] In that Memorandum and Order, the Court denied plaintiff Amaker's motion for a temporary restraining order because plaintiff's motion papers did not establish a sincerely held religious belief with respect to dreadlocks or that the cutting of his dreadlocks would substantially burden that belief, but permitted him to re-file his motion to address those issues.  Dkt. #39, pp.10-11.

precluding plaintiffs' attendance at Nation of Islam services and classes because of their dreadlocks.

## **BACKGROUND**

On February 18, 2006, Sergeant Martinez removed several members of the Nation of Islam, including plaintiff Amaker, from religious instruction at the Attica Correctional Facility ("Attica"), and directed them "to either change their religion or cut their hair" because "only Rastafarian[s] could wear dreadlock[s]." Dkt. #22, ¶ 5. On February 25, 2006, plaintiff Amaker alleges that he was stopped on his way to the hobby shop by C.O. Klodzinski and C.O. Malark, who inquired about his religious affiliation and informed him that he was not allowed to practice two religions and that "only Rastafarians were allowed to wear dreadlock[s]." Dkt. #22, ¶ 6. Plaintiff Hizbullah alleges that Sergeant Martinez informed him on March 4, 2006, that "he had to cut his dreadlock[s] because he was not a Rastafarian." Dkt. #7, ¶ 7.

On March 20, 2006, Sergeant Martinez and Sergeant Corcoran issued plaintiff Amaker a misbehavior report and placed him in keeplock for refusing "to cut his hair or change his religion." Dkt. #22, ¶ 11. Plaintiff was adjudged guilty during the course of the disciplinary hearing and was subsequently issued several additional misbehavior reports for refusing to cut his hair or change his religious affiliation, ultimately suffering 133 days of keeplock between March 20, 2006 and September 1, 2006. Dkt. #22, ¶ 12. He was not permitted to attend Nation of Islam services from March 21, 2006 through August 29, 2006, and was denied Ramadan meals. Dkt. #22,

¶ ¶ 13 & 18.  Plaintiff Hizbullah also claims to have been denied attendance at Nation of Islam classes because of his dreadlocks on 22 occasions between April and September of 2006.  Dkt. #22, ¶ 14.

By letter dated April 4, 2006, Deputy Commissioner Leclaire advised plaintiff Amaker that

> In accordance with Directive #4914, "Inmate Grooming Standards," only inmates whose religious practice is registered as Rastafarian are permitted to wear dreadlocks.  Your registered religion is the Nation of Islam.  You may wear corn row hair braids but they must be woven close to the scalp in straight rows from the forehead to the back of the neck and may not extend below the hair line.

Dkt. #55, p.7.

Plaintiff Amaker asserts that he was sentenced to six months SHU confinement, ending March 3, 2007, thereby preventing his participation in Ramadan and Eld-Ul-Fitr.  Dkt. #30, ¶ 1.  His SHU confinement was subsequently reduced to permit his release on December 5, 2006.  Dkt. #49, ¶ 1.  Plaintiff was transferred to Wende on December 20, 2006, but complains that he did not receive his possessions until December 30, 2006, at which time he discovered his typewriter was damaged.  Dkt. #49, ¶ 2.  Plaintiff also complains that Wende has refused to permit receipt of packages ordered by his family from approved vendors.  Dkt. #49, ¶ 3.

Plaintiff Amaker affirms that his refusal to cut his dreadlocks is based upon a provision of the Holy Quran, specifically, Chapter 2, verse 196, which states, in

part:

> And accomplish the pilgrimage and the visit for Allah.  But if you are prevented, send whatever offering is easy to obtain; and shave not your heads until the offering reaches it's destination.

Dkt. #37, ¶ 2.  Plaintiff Amaker also cites the Bible's Book of Numbers, Chapter 6, Verse 5, commonly referred to as the Nazarite Vow, which provides that

> All the days of the vow of his Naziriteship [sic] no razor should pass over his head; until the days that he should be separated to (Allah) God come to the full, he should prove holy by letting the locks of the hair of his head grow.

Dkt. #44, ¶ 2.  Plaintiff Amaker asserts that DOCS is impermissibly "establishing what religious practices are mandated by particular faiths in violation of" the Establishment Clause and RLUIPA.  Dkt. #44, ¶ 7.

Plaintiff Hizbullah affirms that various sects of Islam, including the Mouride Movement founded in 1887, are famous for growing dreadlocks.  Dkt. #41, ¶ ¶ 2-3.  Plaintiff Hizbullah affirms that he "is an ascetic within the Islamic Faith, and has attended Friday Services & Islamic Classe[s] all of his adult life, and he has worn dreadlocks numerous times, while within Attica Prison's Islamic services and classes, before being denied due to Prison Officials belief [sic] that He [sic] is Rastafarian." Dkt. #41, ¶ 2.  Plaintiff Hizbullah submits for the Court's consideration portions of the Sunan Abu Dawud discussing the matting and growth of hair.  Dkt. #41.

DOCS' Inmate Grooming Standards provide that initial shaves and haircuts shall be required of all newly committed male inmates unless exempted.  Dkt.

#55-3, p.2. Inmates who profess to be a Rastafarian, Taoist, Sikh, Native American, Orthodox Jew, or member of any other religious sect of a similar nature cannot be forced to comply with the initial haircut requirements. Dkt. #55-3, p.4. Thereafter, all inmates are permitted to grow their hair to any length desired by the inmate, but must tie long hair, which is defined as hair below shoulder length, in a ponytail. Dkt. #55-3, pp.3 & 5. Native Americans are exempted from this restriction during the course of scheduled and approved Native American cultural ceremonies. Dkt. #55-3, p.4. The only braids allowed are the corn row style and any such braids must be woven close to the scalp in straight rows from the forehead to the back of the neck, without design or symbols, and may not extend below the hairline. Dkt. #55-3, p.5. In addition, DOCS asserts that, as set forth in Directive #4040, decisions of the Central Office Review Committee ("CORC"),[2] including decisions providing that only inmates of the Rastafarian faith may have dreadlocks, are afforded the effect of directives. Dkt. #55-4, pp.2-5.

Mark Leonard, Director of Ministerial, Family and Volunteer Services for DOCS, is responsible for "ensuring that all religious programs are carried out in accordance with the policies and procedures adopted by DOCS and are supervised by a qualified religious leader." Dkt. #55, ¶ 1. Director Leonard declares that DOCS accommodates religious group activities for a number of religions represented within its

---

[2] DOCS' grievance procedure permits an inmate to file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). An inmate may appeal an adverse decision to the prison superintendent. Thereafter, an inmate may appeal the superintendent's decision to CORC. *See Hemphill v. New York*, 380 F.3d 680, 682 (2d Cir. 2004); N.Y.C.R.R. § 701.7(c)(4).

facilities.  Dkt. #55, ¶ ¶ 2-3.  Upon entry into DOCS, inmates voluntarily state their religion and, if that religion is a recognized religious group, the inmate is permitted to attend that group's religious services.  Dkt. #55, ¶ 10.  "If an inmate is determined to be a bona fide member of the religious group, he/she is entitled to all of the religious privileges afforded to that religious group."  Dkt. #55, ¶ 12.  Although DOCS recognizes that an inmate may practice a group religion in a way that is not recognized by the tenets of the religious group and may claim to need special accommodations in addition to those of the religious group to which he belongs, "DOCS cannot realistically accommodate the religious practices of every inmate who claims his individualized requests for privileges are . . . based on the unique way he practices a group religion."  Dkt. #55, ¶¶ 29-31.

Director Leonard declares that DOCS is unable to accommodate all inmates' individualized beliefs due to (a) the difficulty in determining whether the individualized beliefs are sincere; (b) the substantial administrative burdens; and (c) security concerns.  Dkt. #55, ¶ 41.  Director Leonard notes that "[w]henever an inmate receives special privileges, DOCS needs to monitor those privileges to ensure that the correct inmate receives them and does not abuse them."  Dkt. #55, ¶ 48.  Director Leonard asserts that "[m]aking inmates chose one religion helps ensure that the items and practices associated with that religion are necessary for religious purposes and not to promote illicit activities."  Dkt. #55, ¶ 58.  "Without this restriction," he declares that "any inmate could wear dreadlocks . . . simply by claiming that his religious beliefs required it" which "would make smuggling contraband easier and more prevalent in the

correctional facilities." Dkt. #55, ¶ 58. Director Leonard declares that "the smuggling of contraband in DOCS facilities pose[s] significant security problems and put[s] prison staff and other inmates at risk for serious bodily injury." Dkt. #55, ¶ 60.

Director Leonard confirms that "inmates are not allowed to wear dreadlocks unless it is recognized as part of a designated religious belief" and declares that "[o]nly the Rastafarian religion has a recognized dogma regarding dreadlocks, and therefore DOCS allows only inmates of the Rastafarian faith to wear dreadlocks. Dkt. #55, ¶ ¶ 63, 65. Director Leonard declares that

> The Rastafarian religious mandate and symbolism regarding dreadlocks also appears to be in stark contrast to Nation of Islam, where shaving is seen as a value of cleanliness . . . Nation of Islam . . . religious tenets simply do not require or dictate dreadlocks as a particular hairstyle, and are not an essential part of that faith. As a designated member of [Nation of Islam], plaintiff's decision to wear dreadlocks is a personal choice and is not mandated by his religion. Simply put, [Nation of Islam] does not have a recognized body of religious dogma regarding dreadlocks, and DOCS does not allow [Nation of Islam] or other faith group members to wear dreadlocks.

Dkt. #55, ¶ 67. Director Leonard further declares that

> Plaintiff's claim that he has a right as a designated member of [Nation of Islam] to wear dreadlocks is clearly in conflict with DOCS' policy, rules and regulations . . . and if allowed would result in a[n] increased risk in breach of security for the correctional facility, conflict with Rastafarian principles and cause potential unrest among the Rastafarian inmate population, and jeopardize the safety of the staff and other inmates.

Dkt. #55, ¶ 68. Director Leonard also declares that plaintiff's claim of denial of participation in Nation of Islam services "would appear to be a self-created hardship"

and notes that "[a]s soon as plaintiff complies with DOCS policies and completes his SHU disciplinary penalties, he will be able to attend [Nation of Islam] services and activities."  Dkt. #55, ¶ 69.

## DISCUSSION AND ANALYSIS

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter."  *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986).  "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons."  *Fisher v. Goord*, 981 F. Supp. 140, 167-68 (W.D.N.Y. 1997), *citing Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994).

In most cases, a party seeking to obtain a preliminary injunction must establish that he will suffer irreparable harm in the absence of an injunction and demonstrate either: (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in the movant's favor.  *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).  "Where a moving party challenges government action taken in the public interest pursuant to a statutory or regulatory scheme, however, the moving party cannot resort to the fair ground for litigation standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits."  *Id.* (internal quotations omitted).  In addition, where an injunction is mandatory – that is, where its terms would

alter, rather than preserve, the status quo by commanding some positive act – the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from a denial of the injunction.  *Phillip v. Fairfield University*, 118 F.3d 131, 133 (2d Cir. 1997).  "This heightened standard is also required where the issuance of the injunction would provide the movant with substantially all the relief he or she seeks and where the relief could not then be undone, even if the non-moving party later prevails at trial."  *Id.*  The same standards apply to a party seeking a temporary restraining order.  *Ifill v. Goord*, No. 03-CV-355, 2004 WL 1663994, at *1 (W.D.N.Y. April 8, 2004).

In the instant case, the relief plaintiffs seek by way of their motions for injunctive relief are substantially all the relief they seek by way of this lawsuit, *to wit*, the ability to wear dreadlocks and maintain their religious affiliation with the Nation of Islam.  However, the Court does not believe the heightened standard applies because plaintiffs appear to have been wearing dreadlocks and attending Nation of Islam services prior to DOCS' determination to enforce the CORC decisions limiting dreadlocks to inmates of the Rastafarian faith against plaintiffs.  Dkt. # 22, ¶ 5 & Dkt. #41, ¶ 2 &  p.11.  As a result, an injunction preventing enforcement of the CORC decisions against plaintiffs pending resolution of this lawsuit would preserve the status quo.  In contrast, the Court's denial of a preliminary injunction would permit continued SHU confinement of plaintiffs and prevent their attendance at Nation of Islam services for the duration of this lawsuit.  Such deprivations could not be undone should the plaintiffs ultimately prevail.  Accordingly, the Court will consider whether plaintiffs will suffer irreparable harm in the

absence of an injunction and whether they have established a likelihood of success on the merits.

Likelihood of Success

RLUIPA was enacted following the determination of the United States Supreme Court that the Religious Freedom Restoration Act ("RFRA"), exceeded Congress' remedial powers under the Fourteenth Amendment. *See Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005). RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison. 42 U.S.C. § 2000cc-1(b)(1); *see id.* at 715-16. The statute provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
> (1) is in furtherance of a compelling governmental interest;
>
> and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). This standard is "carried over from RFRA." *Cutter*, 544 U.S. at 717; *see Hoevenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir. 2005) ("test is the same as that previously imposed under RFRA"), *cert. denied*, __ U.S. __, 127 S. Ct. 187 (2006).

By enacting RLUIPA, Congress mandated "a more searching standard of review of free exercise burdens than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." *Lovelace v. Lee*, 472 F.3d 174, 186 (4th Cir. 2006) (internal quotation omitted). "In addition to prescribing strict scrutiny, Congress mandated that RLUIPA be construed 'in favor of broad protection of religious exercise.'" *Id., quoting* 42 U.S.C. § 2000cc-3(g). "Congress, in other words, 'intended to provide as much protection as possible to prisoners' religious rights' without overly encumbering prison operations." *Id., quoting Murphy v. Missouri Dep't of Corr.*, 372 F. 3d 979, 987 (8th Cir.), *cert. denied*, 543 U.S. 991 (2004). Thus, this standard is more stringent than the four-factor, rational-relationship-to-legitimate-penological-interest standard set forth in *Turner v. Safley*[3] for analysis of free exercise claims pursuant to the First Amendment. *See Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). Lawmakers anticipated, however, "that courts entertaining complaints under § 3 would accord 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Cutter*, 544 U.S. at 723.

Defendants argue that "DOCS' application of its rules and regulations and policy . . . do not violate [RLUIPA] since DOCS has not imposed a substantial burden on plaintiff's religious exercise." Dkt. #55, p.9. Although the statute does not define

---

[3] 482 U.S. 78 (1987).

"substantial burden," courts have incorporated the definition adopted in related contexts to conclude that a substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. *See Lovelace,* 472 F.3d at 187; *Jolly*, 76 F.3d at 477. In *Jolly*, the Court of Appeals for the Second Circuit determined that a choice of submitting to a test for latent tuberculosis or adhering to the belief that it is a sin to take artificial substances, such as those allegedly used in the test, into the body and enduring medical keeplock, constituted a substantial burden on plaintiff's religious exercise. *Id.* at 477. In a factually similar case to the instant matter, the Court of Appeals for the Ninth Circuit held that the California Department of Corrections' grooming policy imposed a substantial burden on a Native American's religious practice because it "intentionally puts significant pressure on inmates . . . to abandon their religious beliefs by cutting their hair" or withstand discipline, including keeplock and loss of recreation, telephone, commissary and other privileges. *Warsoldier*, 989 F.3d at 996. As in *Warsoldier*, this Court has little difficulty determining that forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliation with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice.

DOCS relies upon its compelling government interest in maintaining prison security, safety and sanitation to justify its policy. Dkt. #55, p.5. The Court readily recognizes that prison safety and security are compelling governmental interests. *See Cutter,* 544 U.S. at 725, n.13 ("prison security is a compelling state interest"); *Pell v. Procunier,* 417 U.S. 817, 823 (1974) ("central to all other corrections

goals is the institutional consideration of internal security"); *Jolly*, 76 F.3d at 477 (noting DOCS compelling state interest in protecting inmates from infectious diseases). The Court also recognizes that the Court of Appeals for the Sixth Circuit, relying upon prison administrators' averments that there were no other means of achieving prison safety and security, upheld Ohio's absolute ban on long hair. *Hoevenaar*, 422 F.3d 366. In the instant case, however, DOCS has determined that permitting Rastafarians to wear dreadlocks does not impose an insurmountable threat to DOCS' security, safety or sanitation. Moreover, DOCS does not appear to have any concerns that permitting these particular plaintiffs to wear dreadlocks would threaten DOCS' security, safety or sanitation. As stated by DOCS,

> plaintiff can chose to comply with DOCS grooming standards and religious programs and practices set forth in Directive 4914, Directive 4202, and relevant CORC decisions, and attend and participate in [Nation of Islam] services or activities, or change his religious designation to Rastafarian to maintain his dreadlocks and participate in Rastafarian services and activities. The choice is his, but he cannot have it both ways since dreadlocks are not recognized for being religiously mandated for [Nation of Islam] adherents, implicate prison security and administrative concerns, and plaintiff has ample means of practicing his religious beliefs.

Dkt. #54, pp.7-8.

Thus, it is clear that DOCS' concern with plaintiffs' request to wear dreadlocks is the administrative burden of accommodating individual religious beliefs which do not conform to the generally accepted practices of a recognized religious group. *See* Dkt. #55, p.5 ("There would be an enormous administrative burden if DOCS were required to accommodate the individualized religious beliefs of 63,000 inmates.").

While the Court is sympathetic to such difficulties, and does not suggest that DOCS' assessment of administrative burden should not be given deferential consideration, the statute is clear that DOCS cannot administer the religious exercise of its inmate population based upon their assessment of the importance of the requested practice to the religious denomination professed by the inmate.

RLUIPA's definition of "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). This expansive definition was recognized by the United States Supreme Court, which confirmed that the statute "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's professed religiosity." *Id.* at 725.[4] As the Court of Appeals for the Second Circuit explained in the context of a constitutional claim:

> Our founding principles require that courts resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith. For, "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."

*McEachin v. McGuinnis* [sic], 357 F.3d 197, 201 (2d Cir. 2004), *quoting Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989). In other words, "a

---

[4] "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter*, 544 U.S. at 725 (internal citation omitted); *see Ford*, 352 F.3d at 593-94 (The relevant question is whether a particular activity is considered central or important to the inmate's practice of religion). However, defendants do not challenge the sincerity of plaintiffs' belief in the religious texts cited. Dkt. #37, ¶ 2; Dkt. #44, ¶ 2; Dkt. #41, ¶ ¶ 2-3. Moreover, plaintiffs' credibility is bolstered by their determination to suffer keeplock, SHU, and denial of participation in Nation of Islam services and Ramadan meals rather than cut their hair.

burdened practice need not be mandated by the adherent's religion in order to sustain a prisoner's free exercise claim." *Id.* at 203, *citing Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003). Because it is not appropriate for DOCS to restrict plaintiffs' religious practice to those practices which conform to its interpretation of the tenets of the Nation of Islam, defendants' justification for prohibiting plaintiffs from wearing dreadlocks cannot be sustained.

Irreparable Harm

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotations omitted). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 747 (1976). Moreover, "[c]ourts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA." *Jolly*, 76 F.3d at 482. Defendants refusal to permit plaintiffs to attend Nation of Islam services and classes unless they cut their hair satisfies the irreparable injury requirement.

## **CONCLUSION**

Based on the foregoing, it is recommended that plaintiffs' motions for injunctive relief (Dkt. #34, 41, 43), be granted insofar as plaintiffs' seek a preliminary

injunction preventing defendants from punishing plaintiffs for refusing to cut their hair or refusing to change their religious affiliation, and preventing defendants from precluding plaintiffs' attendance at Nation of Islam services and classes because of their dreadlocks, and that their motions (Dkt. ##40, 48, 51), otherwise be denied.

Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order</u>. *Thomas v.*

*Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.</u>

The Clerk is hereby directed to send a copy of this Order and a copy of the Report and Recommendation to the *pro se* plaintiff and counsel for the defendant.

**SO ORDERED.**

DATED:   Buffalo, New York
         March 9, 2007

                                    **S/ H. Kenneth Schroeder, Jr.**
                                    **H. KENNETH SCHROEDER, JR.**
                                    **United States Magistrate Judge**