**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**ANTHONY D. AMAKER,**

**and**

**RUHULLAH HIZBULLAH,**                                                    06-CV-490A(Sr)

                **Plaintiffs,**

**v.**

**COMMISSIONER GLENN S. GOORD,**
**et al.,**

                **Defendants.**
_____


**GEORGE FLUELLEN,**

                **Plaintiff,**

**v.**

**COMMISSIONER GLENN S. GOORD,**
**et al.,**

                **Defendants.**
_____


## REPORT, RECOMMENDATION AND ORDER

       This case was referred to the undersigned by the Hon. Richard J. Arcara,

pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon

dispositive motions.  Dkt. #177.

Currently before the Court is defendants' motion for summary judgment (Dkt. #181), and plaintiffs' cross motion for summary judgment. Dkt. #215. For the following reasons, it is recommended that defendants' motion be granted in part and plaintiffs' motion be granted in part.

## PROCEDURAL BACKGROUND

Plaintiffs Amaker and Hizbullah signed the same amended complaint in this action (Dkt. #22), however plaintiff Fluellen submitted a separate complaint which was assigned its own civil case number. 06-CV-602 at Dkt. #1. In each case, plaintiffs complained that members of the Nation of Islam/Al-Islam seeking to follow doctrine prohibiting the cutting of their hair were denied their rights pursuant to the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), by the New York State Department of Correctional Services' ("DOCS'"), policy of refusing to permit individuals who have designated their religion as anything other than Rastafarian to wear dreadlocks. Dkt. #22 & 06-CV-602 at Dkt. #1.

Plaintiffs' motions for a preliminary injunction were granted and the defendants were "enjoined from (1) precluding Plaintiffs' attendance at Nation of Islam services and classes on account of Plaintiffs' dreadlocks, and in relation thereto from (2) punishing Plaintiffs for refusing to cut their hair or refusing to change their religious affiliations." Dkt. #115 & 06-CV-602 at Dkt. #33. Given the factual and legal similarities

between the two actions, the Court consolidated 06-CV-602 with this action.  06-CV-602 at Dkt. #32.

## **FACTUAL BACKGROUND**

Plaintiff Anthony Amaker entered DOCS in 1989.  *See* http://nysdocslookup.docs.state.ny.us.  Plaintiff Amaker affirms that his refusal to cut his dreadlocks is based upon a provision of the Holy Quran, specifically, Chapter 2, verse 196, which states, in part:

> And accomplish the pilgrimage and the visit for Allah.  But if you are prevented, send whatever offering is easy to obtain; and shave not your heads until the offering reaches it's destination.

Dkt. #37, ¶ 2.  Plaintiff Amaker also cites the Bible's Book of Numbers, Chapter 6, Verse 5, commonly referred to as the Nazarite Vow, which provides that

> All the days of the vow of his Naziriteship [sic] no razor should pass over his head; until the days that he should be separated to (Allah) God come to the full, he should prove holy by letting the locks of the hair of his head grow.

Dkt. #44, ¶ 2.  Plaintiff Amaker has been following this doctrine as a registered member of the Nation of Islam since at least 1996.  Dkt. #44, ¶ ¶ 2, 10 & 14.  He declares that it was not until February of 2006 that DOCS officials at Attica challenged his dreadlocks and ordered him to either change his religion to Rastafarian or cut his dreadlocks.  Dkt. #217, ¶ 2(c).  Plaintiff was issued misbehavior reports, subjected to disciplinary sanctions and denied privileges, including participation in Nation of Islam services and celebrations, for refusing orders to change his religion to Rastafarian or cut his dreadlocks.  Dkt. #217(2).

Plaintiff George Fluellen entered DOCS in 1990.  *See*

http://nysdocslookup.docs.state.ny.us.  In 1994, plaintiff vowed to begin his "journey to

Makka to perform Hajj."  Dkt. #211, ¶ 5.  "In accordance with Allah's command," plaintiff

believes that "if you are impeded on this journey, offer to Allah a sacrifice and do not

shave your heads until the sacrifice reaches its place."  Dkt. #211, ¶ 6.  Plaintiff Fluellen

declares that because his incarceration has impeded his journey, he has not cut his

hair.  Dkt. #211, ¶ 8.  He is a practicing Muslim, registered, for DOCS' purposes, with

the Nation of Islam, and has participated in all available Nation of Islam services,

Ramadans and feasts since their resumption in 1995.  Dkt. #211, ¶ ¶ 4 & 8.  Plaintiff

Fluellen declares that DOCS did not question his dreadlocks during his stay at Great

Meadow from 1994-1996; Auburn form 1996-2002; Green Haven from February

through October of 2002 or at Attica from his arrival in October, 2002 until May, 2006,

when Corrections Officer ("C.O."), Jaboega first ordered him to either cut his hair or

change his religion, and issued a misbehavior report resulting in disciplinary sanctions

when he refused.  Dkt. #211, ¶¶  9, 15 & 28.


Plaintiff Ruhulla Hizbullah entered DOCS in 1999.  *See*

http://nysdocslookup.docs.state.ny.us.  Plaintiff Hizbullah affirms that he is a member of

the Islamic fath, has attended Islamic services & classes all of his adult life and has

worn dreadlocks "numerous times, while within Attica Prison's Islamic services and

classes," before being denied because of his dreadlocks beginning in April of 2006.

Dkt. #22, ¶ 14 & Dkt. #41, ¶ 2.  Plaintiff's identification card pictures plaintiff wearing

dreadlocks.  Dkt. #41, ¶ 4.

DOCS' Inmate Grooming Standards provide that initial shaves and haircuts shall be required of all newly committed male inmates unless exempted.  Dkt. #55-3, p.2.  Inmates who profess to be a Rastafarian, Taoist, Sikh, Native American, Orthodox Jew, or member of any other religious sect of a similar nature cannot be forced to comply with the initial haircut requirements.  Dkt. #55-3, p.4.  Thereafter, all inmates are permitted to grow their hair to any length desired by the inmate, but must tie long hair, which is defined as hair below shoulder length, in a ponytail.  Dkt. #55-3, pp.3 & 5.  Native Americans are exempted from this restriction during the course of scheduled and approved Native American cultural ceremonies.  Dkt. #55-3,  p.4.  The only braids allowed are the corn row style and any such braids must be woven close to the scalp in straight rows from the forehead to the back of the neck, without design or symbols, and may not extend below the hairline.  Dkt. #55-3, p.5.  In addition, DOCS asserts that, as set forth in Directive #4040, decisions of the Central Office Review Committee ("CORC"),[1] including decisions providing that Rastafarian inmates may wear dreadlocks, are afforded the effect of directives.  Dkt. #55-3, pp.2-5.

Mark Leonard, the Director of Ministerial, Family and Volunteer Services for DOCS, is responsible for "ensuring that all religious programs are carried out in accordance with the policies and procedures adopted by DOCS and are supervised by a qualified religious leader."  Dkt. #55, ¶ 1.  Director Leonard declares that DOCS

---

[1] DOCS' grievance procedure permits an inmate to file a grievance with the Inmate Grievance Resolution Committee ("IGRC").  An inmate may appeal an adverse decision to the prison superintendent.  Thereafter, an inmate may appeal the superintendent's decision to CORC.  *See Hemphill v. New York*, 380 F.3d 680, 682 (2d Cir. 2004); N.Y.C.R.R. § 701.7(c)(4).

accommodates religious group activities for a number of religions represented within its facilities. Dkt. #55, ¶ ¶ 2-3. Upon entry into DOCS, inmates voluntarily state their religion and, if that religion is a recognized religious group, the inmate is permitted to attend that group's religious services. Dkt. #55, ¶ 10. "If an inmate is determined to be a bona fide member of the religious group, he/she is entitled to all of the religious privileges afforded to that religious group." Dkt. #55, ¶ 12.

Although DOCS recognizes that an inmate may practice a group religion in a way that is not recognized by the tenets of the religious group and may claim to need special accommodations in addition to those of the religious group to which he belongs, Director Leonard declares that "DOCS cannot realistically accommodate the religious practices of every inmate who claims his individualized requests for privileges are . . . based on the unique way he practices a group religion." Dkt. #55, ¶ ¶ 29-31. Director Leonard declares that DOCS is unable to accommodate all inmates' individualized beliefs due to (a) the difficulty in determining whether the individualized beliefs are sincere; (b) the substantial administrative burdens; and (c) security concerns. Dkt. #55, ¶ 41. Director Leonard notes that "[w]henever an inmate receives special privileges, DOCS needs to monitor those privileges to ensure that the correct inmate receives them and does not abuse them." Dkt. #55, ¶ 48. Director Leonard asserts that "[m]aking inmates chose one religion helps ensure that the items and practices associated with that religion are necessary for religious purposes and not to promote illicit activities." Dkt. #55, ¶ 58. "Without this restriction," he declares that "any inmate could wear dreadlocks . . . simply by claiming that his religious beliefs required it" which "would make smuggling contraband easier and more prevalent in the

correctional facilities." Dkt. #55, ¶ 58. Director Leonard declares that "the smuggling of contraband in DOCS facilities pose[s] significant security problems and put[s] prison staff and other inmates at risk for serious bodily injury." Dkt. #55, ¶ 60.

Director Leonard confirms that "inmates are not allowed to wear dreadlocks unless it is recognized as part of a designated religious belief" and declares that "[o]nly the Rastafarian religion has a recognized dogma regarding dreadlocks, and therefore DOCS allows only inmates of the Rastafarian faith to wear dreadlocks." Dkt. #55, ¶ ¶ 63, 65. Director Leonard declares that

> The Rastafarian religious mandate and symbolism regarding dreadlocks also appears to be in stark contrast to Nation of Islam, where shaving is seen as a value of cleanliness . . . Nation of Islam . . . religious tenets simply do not require or dictate dreadlocks as a particular hairstyle, and are not an essential part of that faith. As a designated member of [Nation of Islam], plaintiff's decision to wear dreadlocks is a personal choice and is not mandated by his religion. Simply put, [Nation of Islam] does not have a recognized body of religious dogma regarding dreadlocks, and DOCS does not allow [Nation of Islam] or other faith group members to wear dreadlocks.

Dkt. #55, ¶ 66. Director Leonard further declares that

> Plaintiff's claim that he has a right as a designated member of [Nation of Islam] to wear dreadlocks is clearly in conflict with DOCS' policy, rules and regulations . . . and if allowed would result in a[n] increased risk in breech of security for the correctional facility, conflict with Rastafarian principles and cause potential unrest among the Rastafarian inmate population, and jeopardize the safety of the staff and other inmates.

Dkt. #55, ¶ 68.

Lucien LeClaire, Jr., the Deputy Commissioner for Correctional Facilities (Security), for DOCS, declares that "[i]f inmates are allowed to unilaterally grow dreadlocks at will, irrespective of legitimate religious requirements, the flood gates would likely spring open and a security nightmare would most certainly ensue." Dkt. #95, ¶ 6. Deputy Commissioner LeClaire notes that "[t]he manufacture and secreting of crude weapons by inmates in a correctional setting, more than anything else, is most responsible for the undermining of safe and secure correctional facilities." Dkt. #95, ¶ 8. Deputy Commissioner LeClaire further notes that such crude weapons "can be rather easily hidden in an inmate's dreadlocks" and that "a metal detector scanning device would not reveal the presence of any weapons that were made entirely of plastic or other non-metallic substance such as drugs or money." Dkt. #95, ¶ 11.

Deputy LeClaire laments that "the latitude that courts sometimes accord to prison inmates in an ostensible attempt to protect their free exercise of religion, oftentimes results, albeit unintentionally, in the undermining of the safety and security of a correctional facility." Dkt. #95, ¶ 12. In support of this argument, Deputy LeClaire notes that following a court decision permitting inmates to designate their religion as Jewish regardless of ecclesiastical tenets, the number of inmates claiming to be Jewish and demanding the more expensive and hermetically sealed kosher meals nearly quadrupled. Dkt. #95, ¶¶ 14-15. Deputy LeClaire emphasizes that

> The Rastafarian faith is, upon information and belief, and after consultation with the Department's Director of Ministerial Services, the only known religion in which the dreadlock is a reconognized religious tenet. As such, Department policy provides for inmates of that faith to wear dreadlocks in spite of the extraordinary difficulty this hairstyle

> presents to security staff as they endeavor to maintain security and control contraband in our facilities. Large dreads and the matted hair close to the scalp create a hairstyle that is extremely difficult to visually inspect and nearly impossible for inmates to run their fingers through to allow staff to insure that no contraband is contained therein, as required by Department Directive #4910 (Control of and Search for Contraband) . . . . It is not merely speculation that inmates may hide contraband in their hair, it is fact.

Dkt. #95, ¶ 17.

Deputy Commissioner LeClaire opines that "it is more than likely that opportunistic inmates who have absolutely no sincerely held religious belief regarding dreadlocks would choose to wear them for nefarious reasons." Dkt. #95, ¶ 18. Finally, Deputy Commissioner LeClaire reiterates that

> [I]t is understood that inmates can change their religion to Rastafarian. Upon completion of the approval process, this would result in them immediately being allowed not only to wear dreadlocks, but also practice all other tenets of that religion. But this result is clearly not what is sought in this case. What is sought in this case is the ability for inmates to pick and choose what tenet of which religion they wish to observe. This practice would throw any reasonable security control of religious practices in corrections in complete chaos and interfere with other inmates' ability to practice their religion, and significantly elevate tensions between those inmates who are sincere adherents of a particular religion and those inmates who seek to avail themselves of the benefit of a particular accommodation for ulterior, non-religious purposes.

Dkt. #95, ¶ 19.

## DISCUSSION AND ANALYSIS

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 799 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of

conjecture or surmise." *Bryant*, 923 F.2d at 982.  A party seeking to defeat a motion for

summary judgment

> must do more than make broad factual allegations and
> invoke the appropriate statute.  The [party] must also show,
> by affidavits or as otherwise provided in Rule 56 of the
> Federal Rules of Civil Procedure, that there are specific
> factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).


**Monetary Damages Under RLUIPA**

Defendants argue that plaintiffs may not obtain monetary damages on a

RLUIPA claim against defendants in either their individual or official capacities, but are

limited to declaratory and injunctive relief.  Dkt. #183, p.14.


Plaintiff argues that monetary damages are appropriate.  Dkt. #216, p.16.


<u>Official Capacity</u>

RLUIPA was enacted following the determination of the United States

Supreme Court that the Religious Freedom Restoration Act ("RFRA"), exceeded

Congress' remedial powers under the Fourteenth Amendment.  *See Cutter v.*

*Wilkinson*, 544 U.S. 709, 715 (2005).   RLUIPA corrected the constitutional infirmity of

RFRA by invoking federal authority under the Spending Clause to reach any program or

activity that receives federal financial assistance, thereby encompassing every state

prison.  42 U.S.C. § 2000cc-1(b)(1); *see Cutter,* 544 U.S. at 715-16.

In accordance with the power afforded by the Spending Clause, Congress may condition grants of federal funds to require waiver of sovereign immunity, even though Congress could not directly order such a waiver. *Van Wyhe v. Reisch*, 581 F.3d 639, 649 (8th Cir. 2009). However, "[w]aivers of the Government's sovereign immunity, to be effective, must be unequivocally expressed." *United States v. Nordic Village*, 503 U.S. 30, 33-34 (1992) (internal quotation omitted). The Government's consent to be sued must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires. *Id.* at 34.

> RLUIPA provides that
>
> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
> > (1) is in furtherance of a compelling governmental interest;
> >
> > and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). This standard is "carried over from RFRA." *Cutter*, 544 U.S. at 717; *see Hoevenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir. 2005) ("test is the same as that previously imposed under RFRA"), *cert. denied*, 549 U.S. 875 (2006). The statute further provides that an individual may assert a violation of these provisions "as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a).

Although the Court of Appeals for the Second Circuit has yet to decide the issue, numerous Courts of Appeals have determined that RLUIPA's "appropriate relief" language does not unambiguously encompass monetary damages so as to effect a waiver of sovereign immunity from suit for monetary claims. *See Van Wyhe*, 581 F.3d at 653;. *Nelson v. Miller,* 570 F.3d 868, 884 (7th Cir. 2009); *Cardinal v. Metrish*, 563 F.3d 794, 801 (6th Cir. 2009); *Sossamon v. The Lone Star State of Texas,* 560 F.3d 316, 331 (5th Cir. 2009); *Madison v. Virginia*, 474 F.3d 118, 130-33 (4th Cir. 2006); 441 F.3d 1022, 1025-26 (D.C. Cir. 2006); *See also Pugh v. Goord*, 571 F. Supp.2d 477, 507-09 (S.D.N.Y. 2008). The Court finds the analysis set forth in these cases persuasive, and therefore recommends that summary judgment be granted in favor of the defendants in their official capacities with respect to plaintiffs' RLUIPA claims for monetary damages.

Individual Capacity

Legislation enacted pursuant to the Spending Clause of the United States Constitution creates a contract between the federal government and the state receiving federal funds. *Smith v. Allen*, 502 F.3d 1255, 1273 (11th Cir. 2007). As a result of this construction, the remedies included within such legislation are enforceable only against the recipient of such funds. *Id.* In other words, although the Spending Clause authorizes Congress to subject the grant recipient to liability in a private cause of action as a condition of funding, such authority "cannot be used to subject individual defendants, such as state employees, to individual liability in a private cause of action." *Id.* at 1274; *see Sossamon*, 560 F.3d at 329 ("Congressional enactments pursuant to the Spending Clause do not themselves impose *direct* liability on a non-party to the contract between the state and the federal government."). As a result, the Court

recommends summary judgment in favor of defendants with respect to plaintiffs' RLUIPA claims in so far as those claims are pursued against them in their individual capacities.

**Injunctive Relief Under RLUIPA**

DOCS argues that it has demonstrated a compelling state interest in enforcing its hair policy because plaintiffs' dreadlocks cannot be adequately searched without putting prison officials at unnecessary risk. Dkt. #183, p.9. In addition, DOCS argues that its hair policy serves the legitimate penological interests of maintaining order, safety and security, asserting that "DOCS' hair policy reduces the opportunity for gang membership and the smuggling of contraband, which pose significant security problems." Dkt. #183, pp.9-10. DOCS also argues that its hair policy is the least restrictive means of achieving DOCS' compelling interest in maintaining prison security. Dkt. #183, p.11. DOCS asserts that if it "had to entertain every inmate's individual requests for exceptions based upon self-created religious beliefs, the correctional system would be unable to function at all." Dkt. #183, p.12.

Plaintiffs argue that defendants cannot demonstrate a compelling state interest in permitting only Rastafarians to wear dreadlocks. Dkt. #213, pp.12-13 & Dkt. #216, p.5.

By enacting RLUIPA, Congress mandated "a more searching standard of review of free exercise burdens than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." *Lovelace v. Lee*, 472 F.3d 174, 186 (4th Cir.

2006) (internal quotation omitted). "In addition to prescribing strict scrutiny, Congress mandated that RLUIPA be construed 'in favor of broad protection of religious exercise.'" *Id., quoting* 42 U.S.C. § 2000cc-3(g). "Congress, in other words, 'intended to provide as much protection as possible to prisoners' religious rights' without overly encumbering prison operations." *Id., quoting Murphy v. Missouri Dep't of Corr.*, 372 F. 3d 979, 987 (8th Cir.), *cert. denied*, 543 U.S. 991 (2004). Thus, this standard is more stringent than the four-factor, rational-relationship-to-legitimate-penological-interest standard set forth in *Turner v. Safley*[2] for analysis of free exercise claims pursuant to the First Amendment. *See Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). Lawmakers anticipated, however, "that courts entertaining complaints under § 3 would accord 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Cutter*, 544 U.S. at 723.

RLUIPA's definition of "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). This expansive definition was recognized by the United States Supreme Court, which confirmed that the statute "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's professed religiosity." *Cutter,* 544 U.S. at 725. As the Court of Appeals for the Second Circuit explained in the context of a constitutional claim:

---

[2] 482 U.S. 78 (1987).

-15-

> Our founding principles require that courts resist the
> dangerous temptation to try to judge the significance of
> particular devotional obligations to an observant practitioner
> of faith.  For, "[i]t is not within the judicial ken to question the
> centrality of particular beliefs or practices to a faith, or the
> validity of particular litigants' interpretations of those creeds."

*McEachin v. McGuinnis* [sic], 357 F.3d 197, 201 (2d Cir. 2004), *quoting Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989).  In other words, "a burdened practice need not be mandated by the adherent's religion in order to sustain a prisoner's free exercise claim."  *Id.* at 203, *citing Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003).  Thus, it is clear that under both the statutory framework of RLUIPA and constitutional case law, DOCS cannot administer the religious exercise of its inmate population based upon its assessment of the validity of the requested practice to the religious denomination professed by the inmate.

"Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter*, 544 U.S. at 725 (internal citation omitted); *see Ford*, 352 F.3d at 593-94 (The relevant question is whether a particular activity is considered central or important to the inmate's practice of religion).  The Court notes that defendants do not challenge the sincerity of plaintiffs' belief in the religious texts cited in support of their determination to wear dreadlocks for purposes of this motion.  Dkt. #183, p.7.  In any event, plaintiffs' sincerity is evidenced by their determination to suffer keeplock, SHU, and denial of participation in Nation of Islam services and Ramadan meals rather than cut their hair.

Although the statute does not define "substantial burden," courts have incorporated the definition adopted in related contexts to conclude that a substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. *See Lovelace,* 472 F.3d at 187; *Jolly*, 76 F.3d at 477. In *Jolly*, the Court of Appeals for the Second Circuit determined that a choice of submitting to a test for latent tuberculosis or adhering to the belief that it is a sin to take artificial substances, such as those allegedly used in the test, into the body and enduring medical keeplock, constituted a substantial burden on plaintiff's religious exercise. *Id.* at 477. In a factually similar case to the instant matter, the Court of Appeals for the Ninth Circuit held that the California Department of Corrections' grooming policy imposed a substantial burden on a Native American's religious practice because it "intentionally puts significant pressure on inmates . . . to abandon their religious beliefs by cutting their hair" or withstand discipline, including keeplock and loss of recreation, telephone, commissary and other privileges. *Warsoldier*, 989 F.3d at 996. Although defendants concede, for purposes of this motion, that its policy imposes a substantial burden upon plaintiffs' ability to wear dreadlocks, as in *Warsoldier*, this Court has little difficulty determining that forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliation with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice. Dkt. #183, p.7.

Having determined that DOCS' grooming policy imposes a substantial burden upon plaintiffs' exercise of sincerely held religious beliefs, the burden shifts to defendants to demonstrate that its policy is the least restrictive means of furthering  a

compelling governmental interest. 42 U.S.C. § 2000cc-1(a). The Court readily

recognizes that prison safety and security are compelling governmental interests. *See*

*Cutter,* 544 U.S. at 725, n.13 ("prison security is a compelling state interest"); *Pell v.*

*Procunier,* 417 U.S. 817, 823 (1974) ("central to all other corrections goals is the

institutional consideration of internal security"); *Jolly*, 76 F.3d at 477 (noting DOCS

compelling state interest in protecting inmates from infectious diseases). The Court

also recognizes that dreadlocks are more difficult to search than straight hair and

increases the opportunity for inmates to conceal contraband. Dkt. #95, ¶ 11.


   However, DOCS' policy with respect to dreadlocks is flawed as a matter of

law because it permits or prohibits dreadlocks based upon its interpretation of religious

doctrine, *to wit*, its determination that Rastafarians are the only religious group required

to wear dreadlocks and that the doctrine of the Nation of Islam does not mandate

dreadlocks, despite statutory language and Supreme Court case law expressly

prohibiting such analysis. A policy based upon such an erroneous legal foundation

cannot survive strict scrutiny. Stated another way, DOCS' determination to restrict

dreadlocks to individuals who profess to be Rastafarian is not the least restrictive

means of managing the security risks associated with dreadlocks. Such a conclusion is

reinforced by the fact that plaintiffs have been wearing dreadlocks in multiple DOCS

facilities while participating in Nation of Islam classes and services for well over a

decade. Dkt. #22, ¶ 14; Dtk. #41, ¶¶ 2 & 4; Dkt. #44, ¶¶ 2, 10 & 14; Dkt. #211, ¶¶ 4, 8-

9, 15 & 28. In addition, DOCS' current policy does nothing to prevent individuals from

wearing dreadlocks for "ulterior, non-religious purposes," because DOCS is willing to

allow any  inmate who professes to be Rastafarian to wear dreadlocks without any

consideration of the sincerity of their religious beliefs.  Dkt. #95, ¶ 19.  Accordingly, it is recommended that plaintiffs be granted summary judgment enjoining defendants from punishing plaintiffs for refusing to cut their hair or refusing to change their religious affiliation, and preventing defendants from precluding plaintiffs' attendance at Nation of Islam services and classes because of their dreadlocks.

**Qualified Immunity on the First Amendment Claim**

Defendants argue that they are entitled to qualified immunity because it was objectively reasonable for them to believe that they were only required to modify DOCS' haircut policy to accommodate the determination of the Court of Appeals that "a policy requiring haircuts of all male inmates upon incarceration violates the free exercise rights of Rastafarians."  Dkt. #183, p.13.

Plaintiffs argue that it was not reasonable for DOCS to require them to designate their religion as Rastafarian in order to wear dreadlocks because the New York Court of Appeals determined in 1986 that DOCS Directive 4914 was unconstitutional as it applied to a prisoner who refused to cut his hair upon arrival into DOCS custody and that the Court of Appeals for the Second Circuit determined in 1990 that Directive 4914 violates the Free Exercise Clause under the First Amendment in 1990.  Dkt. # & Dkt. #216, p.6.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"

*Pearson v. Callahan*, __ 129 S. Ct. 808, 815 (2009), *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "This inquiry turns on the objective legal reasonableness of the action taken, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 822. "For a right to be clearly established, it must have been recognized in a particularized rather than a general sense." *Farid v. Ellen*, 593 F.3d 233, 244 (2d Cir. 2010) (internal quotation omitted). However, "the precise conduct at issue need not previously have been ruled unlawful." *Zahrey v. Coffey*, 221 F.3d 342, 357 (2d Cir. 2000). "The right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Defendants are not entitled to qualified immunity because it was clearly established prior to the time that DOCS attempted to enforce its policy restricting dreadlocks to inmates who identified themselves as Rastafarian that DOCS could not administer the religious exercise of its inmate population based upon its assessment of the validity of the requested practice to the religious denomination professed by the inmate and it was not objectively reasonable for defendants to believe that ordering members of the Nation of Islam to cut their hair or change their religion would not violate that prohibition. See *McEachin*, 357 F.3d at 203 ("a burdened practice need not be mandated by the adherent's religion in order to sustain a prisoner's free exercise claim."); *Ford,* 352 F.3d at 598 (opinion of religious authorities that a particular practice is not religiously mandated under Muslim law, without more, cannot render defendants' refusal to provide that practice to plaintiff objectively reasonable). Accordingly, it is

recommended that defendants' motion for summary judgment on the ground of qualified immunity be denied.

**Merits of the First Amendment Claim**

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford*, 352 F.3d at 588, *citing Pell v. Procunier*, 417 U.S. 817, 822 (1974). However, "[b]alanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.), *cert. denied*, 498 U.S. 951 (1990). As a result, the free exercise claims of prisoners are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588. Accordingly, a regulation that burdens a protected right will pass constitutional muster if it is reasonably related to legitimate penological interests. *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir.2006), *citing O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) and *Turner v. Safley*, 482 U.S. 78, 89 (1987).

It is the inmate's initial burden to demonstrate that the disputed conduct substantially burdens his sincerely held religious beliefs.[3] *Salahuddin*, 467 F.3d at

---

[3] In *Ford*, the Second Circuit noted a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, but declined to resolve the issue and instead assumed the continued applicability of the substantial burden test. Recent cases suggest that the Second Circuit resolved the split in *Salahuddin v. Goord* by subscribing to the substantial factor test. *Koehl v. Greene*, No. 05-CV-582, 2008 WL 4822520, *7, n.11 (N.D.N.Y. Oct. 31, 2008); *Livingston v. Griffin*, No. 04-CV-607, 2007 WL 1500382, at *15 (N.D.N.Y. May 21, 2007); *King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar. 30, 2007).

474-75.  In assessing the sincerity of an inmate's religious beliefs, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."  *McEachin*, 357 F.3d at 201, *quoting Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989).  Instead, courts may only consider whether a claimant sincerely holds a particular belief and whether the belief is religious in nature."  *Ford*, 352 F.3d at 590; *see Jackson v. Mann*, 196 F.3d 316, 321 (2d Cir. 1999) ("the question whether [plaintiff's] beliefs are entitled to Free Exercise protection turns on whether they are 'sincerely held,' not whether he is in fact a Jew under Judaic law.").  For the reasons set forth with respect to plaintiffs' claim for injunctive relief under RLUIPA, plaintiffs have established that DOCS' policy regarding dreadlocks substantially burdens their sincerely held religious beliefs.

Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny.  *Salahuddin*, 467 F.3d at 474-75.  Maintaining prison safety and security by reducing the opportunity for inmates to smuggle contraband is a legitimate penological purpose.  *See Benjamin*, 905 F.2d at 578 ("Preventing the smuggling of contraband, such as weapons and drugs, comports with the type of penological interests contemplated under the *Turner* . . . standard.").

If such a legitimate penological interest is articulated, its reasonableness is then analyzed under the test articulated by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987).  Pursuant to *Turner*,

there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one. We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression.

*Id.* at 89 (internal quotation omitted). Then, the court must ask whether the inmate is afforded adequate alternative means for exercising the right in question. *Id.* at 90. Third, the court must examine the impact that accommodation of the asserted constitutional right will have on guards and other inmates in the prison, and on the allocation of prison resources generally. *Id.* Finally, the court may consider alternatives that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests as evidence that the regulation does not satisfy the reasonable relationship standard. *Id.* at 91. In other words, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* at 90.

As previously discussed under the more stringent standard of review provided by RLUIPA, the fatal flaw of DOCS' policy is that it is not neutral – it permits or denies dreadlocks based not upon the sincerity of the inmate's belief, but upon DOCS' assessment of the validity of that religious belief. Even under a less stringent standard, however, this lack of neutrality renders the governmental objective suspect. Stated another way, there is no legitimate reason for DOCS to afford members of only one

religious denomination the opportunity to adhere to a sincerely held religious belief precluding cutting of hair. Requiring inmates to affiliate with that religious denomination in order to exercise their sincere religious belief in the wearing of dreadlocks is not an adequate alternative means for members of other denominations to exercise their religious beliefs and seems more likely to foster conflict within that religious population than permitting inmates to exercise that practice within their own denominations. In contrast, there is no suggestion within this record that plaintiffs' wearing of dreadlocks while affiliated with the Nation of Islam within multiple DOCS' facilities for more than a decade has had any impact on security within DOCS' facilities. As a result, it is recommended that plaintiffs be granted summary judgment on their free exercise claim.

## CONCLUSION

For the foregoing reasons, it is hereby recommended that:

1.  defendants' motion for summary judgment be granted insofar as defendants seek to dismiss plaintiffs' claims for monetary damages under RLUIPA and otherwise be denied;

2.  plaintiffs' motion for summary judgment be granted insofar as plaintiffs seek permanent injunctive relief pursuant to RLUIPA and that defendants be permanently enjoined from punishing plaintiffs for refusing to cut their hair or refusing to change their religious affiliation and from precluding plaintiffs' attendance at Nation of Islam services and classes because of their dreadlocks; and

3.  plaintiffs' motion for summary judgment be granted with respect to plaintiffs' cause of action alleging a violation of their free exercise rights pursuant to the First Amendment of the United States Constitution.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to

comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of

Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report,

Recommendation and Order), may result in the District Judge's refusal to consider the

objection.

       The Clerk is hereby directed to send a copy of this Report,

Recommendation and Order to the attorneys for the parties.

       **SO ORDERED.**

DATED:     Buffalo, New York
               March 25, 2010

                    **s/ H. Kenneth Schroeder, Jr.**
                    **H. KENNETH SCHROEDER, JR.**
                    **United States Magistrate Judge**